UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X   Case No.: 1:21-cv-3206
JENNIFER MILLER,

                      Plaintiff,

   -against-

IDEAL IMAGE OF LONG ISLAND, LLC and ALYSSA
FLEMING, individually,

                      Defendants.
-------------------------------------------------------------------X

**COMPLAINT**

Plaintiff Demands a
Trial by Jury

Plaintiff, Jennifer Miller, by and through her attorneys, Phillips & Associates, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to 42 U.S.C. §1981, and to remedy violations of the New York State Executive Law and the Administrative Code of the City of New York based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 38 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking damages to redress the injuries she has suffered as a result of being harassed and discriminated against by Defendants on the basis of her race, together with creating a hostile work environment, retaliation, and unlawful termination.

## JURISDICTION AND VENUE

2. The Court has jurisdiction pursuant to 42 U.S.C. §1981, 28 U.S.C. §1331, §1343, and supplemental jurisdiction thereto.

3. This action involves a Question of Federal Law.

4. Venue is proper in this district based upon the fact that a substantial part of the events and omissions giving rise to the claim occurred within the Eastern District of New York. 28 U.S.C. §1391(b).

## PARTIES

5. Plaintiff is an African-American female resident of the State of New York, County of Kings.

6. At all times material, Defendant IDEAL IMAGE OF LONG ISLAND, LLC (hereinafter also referred to as "IDEAL IMAGE") was and is a domestic limited liability company duly existing under the laws of the State of New York.

7. At all times material, Defendant IDEAL IMAGE was and is a medical spa that specializes in skin care and laser hair removal treatments, and which operates three (3) locations throughout New York City and Long Island, as well as a total of 140 clinics across the United States.

8. At all times material, Defendant ALYSSA FLEMING (hereinafter also referred to as "FLEMING") was and is a Caucasian female resident of the State of New York.

9. At all times material, Defendant FLEMING was and is an "Area Manager" at Defendant IDEAL IMAGE.

10. At all times material, Defendant FLEMING was Plaintiff's supervisor and/or had supervisory authority over Plaintiff.

11. Defendant IDEAL IMAGE and Defendant FLEMING are herein collectively referred to as "Defendants."

12. At all times material, Plaintiff was an employee of Defendants.

## MATERIAL FACTS

13. On or about August 11, 2020, Plaintiff began working for Defendants as a "Clinic Manager" at their 23-01 Queens Plaza North, Long Island City, NY 11101 location (the "Queens office").

14. In her role, Plaintiff was responsible for the overall operation of the Queens office, soliciting clients, scheduling skin care procedures, and billing patients.  Plaintiff also managed a staff of two (2) employees, which included a Sales consultant and a Nurse Practitioner.

15. Shortly after the beginning of her employment, and after training at the Garden City location, Plaintiff realized that she was the only African-American "Clinic Manager" working for Defendant IDEAL IMAGE's clinics across the tri-state area.

16. Nevertheless, Plaintiff immediately demonstrated a strong work ethic and was determined to exceed expectations in her role.

17. In fact, on or about August 13, 2020, in a Microsoft Teams message, Defendants' "Franchise Director," Bethany Harris (Caucasian) praised Plaintiff's ability to generate sales, stating, "[A]lready hearing amazing things about you in the center!  Wonderful nearly [$]10k [in sales] yesterday!"

18. On or about August 21, 2020, in a Microsoft Teams group message, Ms. Harris again praised Plaintiff's sales acumen, stating, "[Plaintiff] is our newest seller … she just started an[d] is already showing her serious sales chops."

19. Initially, Plaintiff enjoyed working at Defendant IDEAL IMAGE and anticipated a long career with the company.

20. However, the following month, Plaintiff's direct supervisor, Defendant FLEMING, started to subject Plaintiff to disparate treatment on the basis of her race.

21. Specifically, despite the fact that Plaintiff surpassed her monthly sales goal of $75,000 in sales for the month of September 2020 for the Queens office, Defendant FLEMING arbitrarily

deducted two sales for skin care treatments (approximately $27,000 in total) from Plaintiff's monthly sales figures because her patients requested to receive their first treatment at Defendants' Garden City office, rather than the Queens office, because of where they resided. Defendant FLEMING's decision ultimately prevented Plaintiff from meeting her $75,000 sales goal and earning a bonus for the month of September 2020. Defendant FLEMING blocked Plaintiff from earning the sale because she wanted to make the Garden City office (which was predominantly Caucasian both in terms of staff and clientele) appear more lucrative than the Queens location.

22. Significantly, Defendant IDEAL IMAGE has no written policy stating that a Clinic Manager must schedule a patient's first treatment at their respective office in order for a sale to be counted towards his or her monthly sales goal.

23. Unlike her Caucasian counterparts at the other New York offices, Plaintiff was the only Clinic Manager to meet (and surpass) her monthly sales goal and have her bonus denied for this reason.

24. Defendant FLEMING also treated Plaintiff less favorably than her Caucasian counterparts in terms of workload and business demands.

25. For example, in or around the end the September 2020, "Sales Consultant," Sharea Smith (African-American) resigned from the Queens office due to ongoing harassment and micromanagement by Defendant FLEMING. Rather than interview and hire a replacement, Defendant FLEMING required Plaintiff to take over Ms. Smith's duties, in addition to Plaintiff's own managerial duties. As a result, Plaintiff was also required to greet patients, follow up on potential leads, obtain medical documentation from patients, and perform other clerical and administrative tasks.

26. At the same time, Plaintiff was also required to help Defendants solicit clients for their Garden City location, as well as cover shifts at the Garden City office when it was short-staffed.

27. Throughout her employment, Plaintiff repeatedly complained to Defendant FLEMING about her need for support staff.  Each time, Defendant FLEMING simply dismissed Plaintiff's concerns, telling Plaintiff that it was "normal" for Clinic Managers to run an office without the support of a "Client Care Coordinator."  However, all the other (Caucasian-lead) offices were staffed with either a Client Care Coordinator, a Sales Consultant, or both.

28. As another example of Defendants' racially disparate treatment, from September 2020 to October 2020, Defendant FLEMING denied Plaintiff her "Managers' Bonus," a $500 monthly bonus each Clinic Manager was to receive, regardless of sales or work performance.  By contrast, Defendant FLEMING gave all of the other non-African-American Clinic Managers the Manager's bonus.  Defendant FLEMING did not provide Plaintiff with any justification for denying her bonus.

29. In or around November 2020, only after Plaintiff repeatedly requested the Managers' Bonus, Defendant FLEMING finally paid Plaintiff her first bonus for the month of November 2020.  However, Defendant FLEMING never paid Plaintiff the bonuses she earned for September 2020 and October 2020.

30. In or around the beginning of November 2020, Defendant FLEMING hired a Caucasian female, Susan Russo, to serve as the new Clinic Manager at Defendants' Garden City office.

31. Unlike her treatment of Plaintiff, Defendant FLEMING consistently praised Ms. Russo, excused Ms. Russo's performance deficiencies, and even helped Ms. Russo to meet her sales requirements by offering the contact information of her own family members.  By contrast, Plaintiff received no such support or assistance from Defendant FLEMING.

32. Beginning in or around November 2020, Defendant FLEMING also began to show her racial animus towards Plaintiff and started to make racially discriminatory remarks in the workplace.

33. For example, on or about November 5, 2020, Defendant IDEAL IMAGE received an online "Yelp" review from one of its African-American clients, who complained that Defendant FLEMING denied her a refund and threatened to call the police on her (the client) because she was African-American.

34. Later that month, while discussing the Yelp review with Plaintiff, Defendant FLEMING stated, "**I hate when *they* (African-Americans) use the race card**." Although she was offended by Defendant FLEMING's remark, Plaintiff did not formally complain because she feared that it would negatively impact her employment. As a result, Defendant FLEMING's discriminatory conduct continued.

35. For example, in or around December 2020, Plaintiff told Defendant FLEMING that she was dating a Caucasian man. Defendant FLEMING asked, "**How would your family feel about that?**" Plaintiff replied that her parents had no opinion regarding her boyfriend's race. Defendant FLEMING then told Plaintiff, "**Dating a black guy in my family would *not* go over well**."

36. Beginning in or around January 2021, Defendant FLEMING, Ms. Harris and "Clinic Manager," Rachelle Espinoza, also began to overly scrutinize Plaintiff's performance and listen in on her consultations with clients because they did not believe that she could meet and/or exceed the sales goals of her Caucasian or non-African-American colleagues.

37. In or around the beginning February 2021, in order to set Plaintiff up to fail, Defendant FLEMING increased Plaintiff's monthly sales requirement by $15,000 (from $50,000 in January 2021 to $65,000 in February 2021).

6

38. Despite Defendant FLEMING's discriminatory conduct, Plaintiff continued to perform her duties in an example manner.

39. In fact, by February 18, 2021, Plaintiff had already surpassed her February sales goal, generating $72,223 in sales for her office. Plaintiff also had a 100% sign-up rate for all of her in-person consultations. However, rather than commend Plaintiff on her efforts, Defendants chose to scrutinize Plaintiff's sales numbers because of her race and because they perceived her to be less capable than her Caucasian counterparts.

40. For example, on or about February 22, 2021, during a virtual "Zoom" video conference meeting, Ms. Harris questioned Plaintiff's sign-up rate, stating, "I don't know if your numbers are correct. I have to look into it." Plaintiff assured Ms. Harris that her sales numbers and sign-up rate were accurate. Ms. Harris replied, "With stats like that, anyone would question it."

41. Later that day, Defendants' "Nurse Practitioner," Mellany Lopez, who was also present during the Zoom meeting, sent Plaintiff a text message acknowledging the differential treatment Plaintiff received at the Queens location. Specifically, Ms. Lopez wrote, "I do feel like [Q]ueens doesn't get the acknowledgement you deserve … [I'm] glad youre [sic] standing up for yourself."

42. As another example of Defendants' discriminatory conduct, later that afternoon, Defendant FLEMING arbitrarily deducted a $15,000 sale from Plaintiff's February 2021 sales goal.

43. Specifically, in a Microsoft Teams message, Defendant FLEMING claimed that the sale could not be counted towards Plaintiff's February 2021 sales goal because the client was scheduled to receive treatment in the month of March 2021. Plaintiff informed Defendant FLEMING that she had already secured payment for the treatment and that the client scheduled her appointment in March 2021 due to concerns about COVID-19 exposure. Nevertheless,

Defendant FLEMING refused to allow Plaintiff to count the sale towards her February sales goal, and even proposed issuing the client a refund for the treatment that was booked, even though the client never requested one.

44. When Plaintiff inquired about the written company policy supporting her arbitrary denial, Defendant FLEMING condescendingly replied, "I will review with you Tuesday, it is very clear you do not understand and I am happy to spend the time helping you understand better however it won't be via back and forth text messages."  In response, Plaintiff complained, "No, what I understand is that management does not want me to do well […] **I no longer feel comfortable discussing this … Everything feels discriminatory**."

45. The next morning, on or about February 23, 2021, Defendant FLEMING sent Plaintiff a Microsoft Teams message, asking Plaintiff to explain why she felt discriminated against. Plaintiff, who was working, did not see the message.

46. Shortly after, Defendant FLEMING scheduled Plaintiff for a Zoom video conference meeting with Human Resources (HR) for 2:00 p.m. that afternoon.

47. The same morning, at approximately 9:30 a.m., newly hired "Guest Services Representative," Constance Anderson (African-American), who worked in the Garden City location, sent Plaintiff a Microsoft Teams message confirming the racially hostile work environment at Defendant IDEAL IMAGE.  Specifically, Ms. Anderson wrote, "**[D]o you feel picked on? [B]y management[.] I am feeling away [sic].  [I] been trying to ignore it**."  Plaintiff replied, "Yes," and asked Ms. Anderson to contact her via text message.

48. During their text message conversation, Plaintiff told Ms. Anderson that she also felt discriminated against because of her race, and informed her that she was scheduled for a 2:00 p.m. meeting to make a formal complaint.  Ms. Anderson asked Plaintiff to also make a race

discrimination complaint on her behalf. Plaintiff agreed to escalate Ms. Anderson's complaint, and also encouraged Ms. Anderson to make her own complaint to HR.

49. Later that afternoon, when she logged in the 2:00 p.m. Zoom call, Plaintiff realized that Defendant FLEMING, Ms. Harris and Ms. Espinoza were also on the call. Plaintiff was uncomfortable with making a complaint against Defendant FLEMING while she was attending the meeting, and stated, "I thought this meeting would be confidential." HR Representative, Jenifer Logan, ignored Plaintiff's comment and stated, "I know you had some questions about a sale."

50. During the call, Plaintiff complained,

> "**This call is about me being discriminated against, and I thought the call would be confidential between HR and myself. Just this morning, [Ms. Anderson] reached out to me about feeling picked on by management too, and asked me to bring it up. It seems like racism is the culture at [Defendant IDEAL IMAGE] even down to the clients**."

51. Ms. Logan quickly dismissed Plaintiff's complaints and asked, "**So why do you still work here? I've been here for over 14 years and I know for a fact we don't have that problem.** Plaintiff replied, "Because I need a job." Ms. Logan then abruptly ended the meeting, gave Plaintiff her cell phone number, and stated that she would schedule another meeting with Plaintiff after 3:00 p.m. that day. However, Plaintiff did not hear back from Ms. Logan for the rest of the afternoon.

52. At approximately 5:30 p.m., without explanation, Ms. Logan telephoned Plaintiff on her work phone line and instructed her to turn in her office key to "Nurse Practitioner," Cleopatra Maack.

53. Then, approximately 30 minutes later, Defendants deactivated Plaintiff's email and all of her work accounts.

54. Later that afternoon, at approximately 6:41 p.m., Plaintiff contacted Defendants' "Business Manager," Michael Donahue to inquire about the status of her employment. In a text message, Plaintiff wrote:

> "I'm not sure if you were made aware but **I expressed to [Defendant FLEMING] that I feel discriminated against and she scheduled a meeting with [HR].** We really didn't cover the details because [Ms. Logan] had another meeting so [we] agreed to talk later in the day. … [Ms. Logan] called me back and said to turn my key over to [Ms. Maack] … then I noticed my logins were deactivated so it seems I'm being terminated … I'm still waiting to hear back from [Ms. Logan] or [Defendant FLEMING] regarding the status of my employment at [Defendant IDEAL IMAGE]."

Mr. Donahue did not respond to Plaintiff's text message.

55. Later that evening, at approximately 7:30 p.m., Ms. Logan called Plaintiff's cell phone and terminated her employment for allegedly reporting inaccurate work hours on February 2, 2021, more than two (2) weeks prior to Plaintiff's complaint.

56. Defendants' stated reason for terminating Plaintiff is pretext because Defendants allowed their staff, including Plaintiff, to work from home on February 2, 2021 due to the impending snowstorm. Plaintiff worked a full eight (8) hour workday and even provided Defendants with a picture of her call log in order to substantiate her hours.

57. Defendants terminated Plaintiff **the same day** that she complained about race discrimination in the workplace.

58. Defendants harassed and discriminated against Plaintiff because of her race.

59. Defendants treated Plaintiff worse than her non-African-American colleagues because of her race.

60. Defendants subjected Plaintiff to disparate treatment because of her race.

61. Defendants would not have terminated Plaintiff but for her complaints of race discrimination.

62. As a result of Defendants' actions, Plaintiff felt, and continues to feel, extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

63. As a result of the Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered severe emotional distress and physical ailments.

64. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

65. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages.

## AS A FIRST CAUSE OF ACTION
## UNDER FEDERAL LAW
## 42 U.S.C. SECTION 1981

66. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

67. 42 U.S.C. Section 1981 states in relevant part as follows:

    a. Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

    b. "Make and enforce contracts" defined for purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C.A. § 1981.

68. Plaintiff was discriminated against because of her race as provided under 42 U.S.C. Section 1981 and has suffered damages as set forth herein.

69. Plaintiff also claims retaliation and a hostile work environment under 42 U.S.C. Section 1981.

## AS A SECOND CAUSE OF ACTION
## UNDER STATE LAW
## DISCRIMINATION

70. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

71. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's … race … to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

72. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff on the basis of her race, together with creating a hostile work environment and unlawful termination.

73. Plaintiff hereby makes a claim against Defendants under all applicable paragraphs of Executive Law Section 296.

## AS A THIRD CAUSE OF ACTION
## UNDER STATE LAW
## RETALIATION

74. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

75. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

"For any person engaged in any activity to which this section applies to retaliate or discriminate against any person before he has opposed any practices forbidden under this article."

76. Defendants engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against Plaintiff because of her opposition to Defendants' unlawful actions.

## AS A FOURTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## DISCRIMINATION

77. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

78. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

79. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff on the basis of her race, together with creating a hostile work environment and unlawful termination.

## AS A FIFTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## RETALIATION

80. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

13

81. The New York City Administrative Code Title 8-107(7) provides that:

> "It shall be unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter…"

82. Defendants engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against Plaintiff, including, but not limited to terminating Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that the Defendants engaged in unlawful employment practices prohibited by the 42 U.S.C. §1981, the New York State Executive Law, and the Administrative Code of the City of New York on the basis of Plaintiff's race, together with creating a hostile work environment, retaliation, and unlawful termination;

B. Awarding damages to the Plaintiff, retroactive to the date of discharge, for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful discharge and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of this action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial, plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated: June 7, 2021
      New York, NY

By: */s/ Bryan S. Arce, Esq.*
**PHILLIPS & ASSOCIATES, PLLC**
*Attorneys for Plaintiff*
Bryan S. Arce, Esq.
45 Broadway, Suite 430
New York, NY 10006
(212) 248-7431